Benjamin F. CHAVIS; Connie Tindall; Willie Earl Vereen; Marvin Patrick; Anne Sheppard Turner; Joe Wright; Wayne Moore; Reginald Epps; Jerry Jacobs; and James McKoy, Appellants,

v.

STATE OF NORTH CAROLINA; Frances N. Futch; Kitchen S. Powers; Sam P. Garrison; Louis Powell, Superintendent of N. C. Correction Center for Women; Amos E. Reed; and J. C. Harris, Superintendent, McCain Correctional Unit, Appellees,

55 Members of Congress listed on Amici Curiae Motion, Amici Curiae.

No. 80–6084.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 9, 1980.

Decided Dec. 4, 1980.

James E. Ferguson, II, Charlotte, N. C. (James C. Fuller, Jr., Chambers, Stein, Ferguson & Becton, P. A., Charlotte, N. C., John T. Redmond, Redmond & Pollio, Garden City, N. Y., on brief) for appellants.

Richard N. League, Sp. Deputy Atty. Gen., Raleigh, N. C. (Rufus L. Edmisten, Atty. Gen. of North Carolina, Raleigh, N. C., on brief) for appellees.

David Bonderman, Washington, D. C. (Walter J. Rockler, Richard H. Gordin, Charles H. Cochran, Arnold & Porter, Washington, D. C., on brief) for amici curiae.

Before WINTER, BUTZNER and SPROUSE, Circuit Judges.

WINTER, Circuit Judge:

Mike's Grocery Store in Wilmington, North Carolina, was firebombed and burned on February 6, 1971, and the perpetrators of that crime, using various weapons, fired upon the firemen and policemen attempting to extinguish the fire. Benjamin F. Chavis and his nine co–petitioners were variously convicted in the Superior Court of Pender County, North Carolina, of felonious burning of that property and conspiracy to assault emergency personnel at the scene of the burning.[1] Their appeals and post–conviction challenges to the validity of their convictions were decided adversely to them in the North Carolina courts and their consolidated petitions for writs of habeas corpus were denied by the district court.[2] They appeal, contending that the writs should have been granted on any one of numerous grounds. We find at least three of these arguments meritorious, and we therefore reverse the judgment of the district court and direct that the writs shall issue.

## I.

### A. Introduction.

As a preface to a statement of the facts, it is appropriate for us to outline our overall view of the case. Chavis and his co–petitioners mount a multifaceted attack on the validity of their convictions. They contend that their rights of confrontation and cross–examination and their right to a fair trial were denied in the following respects:

1. by the concealment by the prosecutor and the trial court, despite petition-

---

1. Chavis' co–petitioners are Connie Tindall, Willie Earl Vereen, Marvin Patrick, Joe Wright, Wayne Moore, Reginald Epps, Jerry Jacobs and James McKoy, all black males, and Anne Sheppard Turner, a white female. Chavis and his male co–petitioners were convicted of both crimes. Mrs. Turner was indicted and convicted only of being an accessory before the fact to the unlawful burning of property with an incendiary device.

2. The record does not disclose the present status of petitioners, but apparently with the exception of Mrs. Turner they are on parole. By the end of 1978, Mrs. Turner was discharged from parole. In this appeal the petitioners' right to maintain this action is not questioned.

ers' repeated requests for production, of an "amended" pretrial statement of a key witness both containing crucial impeachment material and falsely described by the witness to the jury;

2. by the refusal of the trial court to permit cross–examination of the same key witness and another significant witness regarding special favorable living conditions furnished to them by the prosecution and other matters in order to show bias on the part of these witnesses;

3. by the concealment by the prosecutor, despite a defense request for disclosure, of inducements for testimony and special favorable treatment offered to each of three important prosecution witnesses including leniency, accommodations at a beach motel and beach cottage paid for by the prosecution, an expense–paid trip for the girlfriend of the chief witness, and the gift of a minibike made after trial;

4. by the prosecutor's omission of fourteen names from the pre–trial witness list presented to defense counsel;

5. by the prosecution's use of testimony of each of its three key witnesses which it knew or had reason to know was perjured; and

6. by the prosecution's pre–trial exhibition of marked photographs of petitioners to key prosecution witnesses for purposes of identification.

They also contend that their right to trial by a fair and impartial jury was denied them by the trial court's refusal:

1. to permit effective inquiry into the ability of veniremen to apply the pre-

sumption of innocence and into their racial attitudes and experience;

2. to excuse for cause jurors who were biased against petitioners; and

3. to conduct the voir dire examination of each potential juror out of the presence of jurors already chosen and prospective jurors.[3]

Many of these contentions have a sharply–contested factual basis. In deciding the case, however, it is not necessary for us to delve into contested facts, because we think that the prosecution's failure to produce and make available to defense counsel the "amended" statement and the record of the hospitalization of the state's key witness and the restrictions upon cross–examination of the key witness and another about favorable treatment which might have induced favorable testimony require us to overturn the convictions. As to these issues, the facts are undisputed. Accordingly, we will confine ourselves solely to the facts relating to those issues and the legal contentions made concerning them. We will not mention other facts in the case nor do we express any opinion on any of the legal issues except those specifically decided.

B. General.

The community of Wilmington, North Carolina, which is in New Hanover County, was beset with racial tensions in the period following court–ordered desegregation of the New Hanover County schools. As a result of the court decree, the previously all–black high school was closed and its students transferred to previously all–white high schools. As a protest, black students boycotted the schools during the last week

---

**3.** A number of additional arguments have been advanced by the fifty–five members of the United States Congress who have been permitted to participate as amici curiae, and Chavis and his co–petitioners have adopted them. They are that petitioners' rights were violated by:

  1. the admission of irrelevant and inflammatory evidence;

  2. the suppression of the Cherry Hospital report of Allen Hall containing impeachment material;

  3. inflammatory and improper closing argument of the prosecutor;

  4. constitutionally impermissible exhibition of marked photos of petitioners' identification procedure;

  5. the limitation of cross–examination;

  6. the failure to sequester jurors on voir dire; and

  7. the omission of fourteen names on the witness list furnished defense by the prosecutor.

of January, 1971. There were counter-activities on the part of whites.

The black students and other members of the black community obtained the use of Gregory Congregational Church in Wilmington as a meeting place to discuss the problem and to plan their activities. Petitioner Chavis, who was a staff member of the United Church of Christ's Commission for Racial Justice, came to Wilmington and met with the students. On or about Thursday, February 4, 1971, there was a report that the church would be bombed. A group of students decided to stay in the church and defend it. In fact it was not bombed, but a shooting spree began throughout the church neighborhood and continued for four days.

On Saturday evening, February 6, 1971, while the shooting continued, Mike's Grocery Store, located approximately one block from the church, was firebombed and burned to the ground. It was a white-owned business in a black neighborhood, and its owner was reputed to have slapped a black girl. Police and firemen who responded to the incident were shot at by unidentified persons at the scene of the fire. One policeman shot and killed a black youth near the scene of the fire, and the following morning an armed white man riding through the church neighborhood was shot and killed by an unidentified person or persons.

Chavis and his nine co-petitioners were variously indicted and convicted under North Carolina law for firebombing and burning the grocery store building and for conspiring to assault emergency personnel at the scene of the fire.[4] At their trial, the principal witness against them, described in the state's brief as its "major witness," was Allen Hall.[5] Indeed, it was not until Hall was arrested, gave a confession incrimina-

ting himself, Chavis, another petitioner, and some unnamed youths, was convicted and was sentenced to a term of twelve years that he was interviewed at length and gave information which served as a basis for petitioners' arrest and the charges against them. The credibility of Hall as a prosecution witness was crucial to North Carolina's case.

Hall's testimony unquestionably incriminated Chavis and his co-petitioners. He described in detail how Chavis had come to Gregory Congregational Church and assumed a leadership role with respect to the persons who assembled there. According to Hall, Chavis directed the procurement of gasoline. He instructed the others in the manufacture of firebombs and supervised their manufacture. He also instructed them in how to light and throw firebombs. He also counselled a break-in of a gun shop to procure weapons and ammunition. He advocated the "Chicago strategy", the firebombing of buildings and the ambush of firemen and policemen who responded to the blaze. He planned, directed, and led a firebombing of the grocery store on Friday night, February 5, but the attempt was abortive because the bomb hit a window screen and went out. Specifically with reference to Saturday night, Hall described the role of Chavis in counselling, directing, and participating in the successful firebombing as well as the participation of the co-petitioners in that unlawful activity. He testified that Chavis had furnished guns to him and to others, that Chavis told them how to select a place to set on fire, and how to shoot at firemen and policemen when they responded to the blaze. Freely admitting his own participation in setting fire to the grocery store, Hall testified that both he and Chavis shot at the firemen and policemen several times.[6]

4. See n.1, supra.

5. North Carolina's other two key witnesses were Jerome Mitchell, a seventeen-year-old high school dropout and Eric Junius, a twelve-year-old student.

6. When the trial record is examined, it is readily apparent that North Carolina's case depend-

ed entirely on Hall's credibility. North Carolina's other key witnesses, see n.5, supra, provided significant peripheral corroboration to Hall's testimony, but their testimony alone would have been insufficient to support the conviction of Chavis and the others of the substantive

## C. Hall's Amended Statement and Efforts to Obtain It.

Hall had been questioned on numerous occasions prior to trial by James T. Stroud, the North Carolina prosecutor, about the events of February 5 and 6, 1971. On May 30, 1971, Hall signed a short, one–page written statement, but on February 18, 1972, after his own conviction for his participation in the crimes, he gave a much fuller and more informative interview. The information that he gave during this interview was reduced to a nine–page typewritten statement which Hall read and signed under oath. He made no additions or corrections to this statement at that time, although he was offered the opportunity to do so.

Before the trial began, defense counsel filed a motion requesting a court order compelling the state, *inter alia*, to make available to the defendants for inspection and copying all evidence in the state's possession "which will or may be used against the [petitioners] in their trial," and all statements taken from witnesses and all material and information "now known ... or which may become known ... which is exculpatory in nature or favorable to the defendants or which may lead to exculpatory material." Voluntarily, the prosecutor furnished defense counsel with Hall's two statements, and in the presence of the court the prosecutor represented that "[t]here are no other written statements that I am aware of ...." But, as will be shown, this was not so.

Hall testified on direct examination for a number of days, and he was cross–examined for no less a period. He was confronted with inconsistencies between his direct testimony and both his testimony at a preliminary hearing and his first written statement, that of May 30, 1971. These were relatively few in number and minor in nature. Hall was also cross–examined about apparent inconsistencies between his testimony on direct and on cross–examination and statements and omissions in his detailed statement of February 18, 1972. In at least fifteen significant respects, Hall's testimony differed from his statement of February 18. With regard to these inconsistencies, he testified that after having given the statement of February 18, he realized that the statement was neither accurate nor complete in all respects. As a result he sent word to prosecutor Stroud to come to see him at the Lumberton Prison where he was incarcerated at the time. He testified that when Stroud came to see him, he told Stroud about the inaccuracies and omissions in the February 18 statement, and Stroud corrected them. The corrections, handwritten on Stroud's typed copy of the statement, were seen and approved by Hall and the corrected or "amended" statement, which had not been furnished to counsel, was Hall's final statement.[7] Hall conceded

---

crimes. Jerome Mitchell testified about the events of Friday night and the fact that Chavis spoke of firebombing the Shop–Rite store on Greenfield Street at some later date, and described some of the activities at the church on Saturday night including his fulfillment of Chavis' request to get ammunition. While Mitchell testified that he saw two unknown persons go to Mike's Grocery Store, he could not identify who firebombed it or who·shot at the police and firemen. Similarly, Eric Junius, while able to identify nine petitioners as having been at the church on Saturday night and able to testify that Chavis had spoken about firebombing Mike's and shooting at emergency personnel, could not say what had occurred at the scene of the blaze. After others left the church, presumably on their way to the grocery store, Junius mashed his finger with a door, and he remained at the church receiving first

aid while the firebombing and shooting took place.

7. The testimony of Hall which is the basis for the factual statements in the text follows. Hall was being cross–examined by counsel for Chavis:

Q. Did you ever see that statement that Mr. Stroud prepared?

A. He haven't prepared no statement to my knowledge. He just filled in. Whenever I talked to him he just wrote it on his statement where I had in February 18, but I haven't seen none of the statement. I saw the statement whenever we was together, whenever he was filling it in.

Q. So you have seen the statement that Mr. Stroud–that you say Mr. Stroud had after he made all the additions and corrections to it?

that he had seen his corrected statement since he began testifying in the case.[8]

When Hall first attempted to explain away the inconsistencies between his in-court testimony and his written statement by asserting that he had corrected his written statement at his interview with Stroud, defense counsel moved for a copy of the statement bearing the additions and corrections made by Stroud. Stroud opposed the motion setting forth both his version of how the statement had been changed and assert-

> A. It is the same statement. It is not narry new statement. It is the same statement, but it is the one he put the additions onto. I remember that. I remember seeing the statement where he had of mine where he put the addition on where I had gave him February 18, 1972. That statement is my final statement as to all events that took place. That is my statement just like that first statement is my statement.
> Q. And that second statement is also your statement?
> A. Yes, sir.
>
> .     .     .     .     .
>
> Q. Are there any notations on that second statement put on there by Mr. Stroud that you did not tell him to put on there?
> A. No, sir; there isn't anything on the statement that I didn't say put on there what Mr. Stroud put on the statement was my addition to the statement was mine, and he did not add nothing to the statement.
> Q. And every single thing that is on that statement that you saw as amended and as supplemented is your statement?
> A. Yes, sir.
>
> .     .     .     .     .
>
> A. Whenever Mr. Stroud come—came rather, he brought his statement with him. I told him what was left out of the statement, and I told him about some of the things that was misplaced on wrong parts on the statement; and so he wrote them down on his statement on the sides of his statement. What he wrote down is what I told him to write down. I cannot tell you approximately how long I stayed at the Community Center and the hospital.

8. During cross-examination by counsel for Chavis, Hall testified as follows:

> A. . . . I did not just talk to Mr. Stroud during this recess. I did not see Mr. Stroud's copy of the statement during the recess. I can't say offhand when I last saw it.
> Q. Been since you have been in court here?
> A. What day? No sir.
> Q. This week or last week or the week before that?

ing the privilege of work product.[9] The trial judge sustained the prosecutor's position and denied the motion for production. As Hall's interrogation on cross-examination continued and as he both continued to explain away inconsistencies between his testimony and the written statement on the ground that the latter had been changed and to insist that his trial testimony was consistent with the corrected statement, the motion for production was renewed five times and each time denied. At the request

> A. I can't say right offhand.
> Q. You can't say offhand whether or not it's been since you have been in court?
> A. The first week before it started, Court started.
>
> .     .     .     .     .
>
> I have talked to Mr. Stroud and seen that statement since I have been up here in court these past three weeks. I seen Mr. Stroud, and I have talked to him. I have seen the statement since I have been here in court. Mr. Stroud did not seem dissatisfied with my statement when he came up the Lumberton to see me.

9. The full text of Mr. Stroud's response follows:

> As I recall what the witness testified to he said everything he's testified to here in court he had told the detectives, Bill Walden and myself in the interview at Cherry Hospital. Then there was a typed statement made, presented to him. At that time he did not make any additions or corrections to it. He signed it. Less than a week later I was notified to come to Lumberton to talk with him about his statement. I went to Lumberton. I took a copy of the typed statement that he had signed and during the time that I talked with him concerning his activities on February 5 and 6, 1971, at Lumberton, he stated things that he had previously stated at Cherry Hospital which were not in the typewritten statement. And so at that time on my copy of the statement I made certain additions that had been made in the typewritten statement. This was solely for my benefit, for my use as a Solicitor prosecuting the case. I contend that I, having given the signed typewritten statement to the defense attorney which they have in their presence and which they have cross examined Mr. Hall about, is what they requested. They requested his signed statement and that is what I gave them. That any notes that were made after he signed that statement were work products of my office in my position and that I am not obligated under law to let them have my notes.

of defense counsel the trial court did agree to examine the corrected statement and make it a part of the record, even if it was not shown to counsel. Finally, after Hall's testimony had been completed, the trial court renewed its ruling not to show the corrected statement to counsel stating that because the corrections were in the handwriting of the prosecutor and were his work product, they could not be examined by defense counsel.[10] A motion by counsel to interrogate Stroud concerning the statement was denied.

An analysis of Hall's claims of correctness and additions to his written statement and the corrected statement itself made by the Department of Justice, which appeared as amicus curiae in the district court, shows that thirteen of the changes claimed to have been made by Hall simply do not exist and that four probably do exist. In addition, there are six notations on the statement, such as "conflict", "motive", "do not bring out on direct", etc., which appear to be Stroud's work product, and one amendment, "someone else said this", which conflicts with Hall's testimony that Chavis counselled breaking into a gun shop and thus would exculpate Chavis in this respect. In the district court, North Carolina conceded that eleven of the corrections claimed to have been made by Hall did not exist. The important fact for the decision of this case is that, irrespective of the exact number, many of the corrections which do not exist relate to significant evidence and would have provided fertile ground to impeach Hall as a witness. A few examples demonstrate the point. The presence or absence of Jerome Mitchell, one of the state's other key witnesses, at the church on Saturday night when the grocery store was bombed and burned was crucial because Mitchell purported to describe much of what transpired at the church. Hall's statement is not amended to show that Mitchell was there as Hall testified. The statement is not amended to set forth that, on Friday,

Chavis told Hall to throw a firebomb or that Chavis handed Hall a firebomb or lit it, as Hall testified. The statement does not set forth that petitioner McKoy threw firebombs as Hall testified. The statement does not set forth that Hall, Chavis, and another passed six sticks of dynamite in a plastic bag into the basement window of the Gregory Congregational Church, or that Hall and some of the petitioners shot at cars on Friday evening, February 5, as Hall testified. There are no amendments reflecting a change in Hall's whereabouts on Saturday, February 6, when he returned to the church that night nor are there any amendments about certain of his activities on Friday night as he testified at trial. Nevertheless, Hall testified that all of this information was in his corrected statement given to Stroud. Thus, confronted by inconsistencies with his written statement, which had been furnished to defense counsel, Hall misrepresented to the jury that his testimony was consistent with his corrected statement which was withheld from the defense.

### D. Hall's Psychiatric Report.

In the course of cross-examination, Hall admitted that he had been in Cherry Hospital in October 1971, for a period of fifty days. He denied that he was there for a mental examination, and later in his testimony said that he was there because he had heard that another person accused of crime had gone there and then been placed on probation. In any event, the Hospital is a mental institution, and its report on Hall indicates that he was hospitalized to determine his competency to stand trial on the charges of assault with a deadly weapon, assault, arson, and assault on emergency personnel.

The report shows that Hall was found competent to stand trial. Significant to this case are the statements in the report that "[p]sychological tests reveal an IQ of 82 placing him in the range of borderline defective" and "[a]s to the charge of arson

---

10. At this stage of the proceeding defense counsel questioned whether the corrected statement referred to by Hall in his testimony and the copy of the February 18 statement with additions and corrections in Stroud's handwriting were one and the same. Stroud assured counsel and the trial judge that they were.

of a grocery store, he states that he did not participate in this, but he was present on the scene when the store was burned." The latter statement was, of course, clearly at odds with Hall's testimony at the trial of Chavis and his co–petitioners; the former may have had some bearing on Hall's ability to recall in minute detail events that occurred at least one and one–half years prior to the time that he was testifying.

Prior to the beginning of the trial, defense counsel made a motion for production of exculpatory material or material leading to exculpatory data. In a companion motion, counsel moved for the production of "[a]ny and all scientific or medical, psychiatric or other reports which might tend to reflect on the credibility or competence of any of the prospective witnesses for the State." While this motion was granted by the trial court, the prosecutor failed to furnish the hospital report although at a later time he testified before a federal grand jury that he was sure that he had a copy at the time of trial.

### E.  Limitations on Cross–Examination.

In a pretrial motion, renewed on the day that trial began, counsel for petitioners sought discovery of "[a]ny promises made or actions taken by the State which caused or might have caused any witness for the State to testify on behalf of the State . . . ." On both occasions, on the representation by the prosecutor that "[no] deals with State's witnesses . . . have been made," the motion was denied.

When Hall was cross–examined, counsel made an effort to determine whether Hall was being kept in a prison unit while the trial was going on. An objection to this line of questioning was sustained, and while Hall was permitted to give an answer for the record indicating that he was probably the subject of some special arrangement, that answer was not communicated to counsel. When Hall was interrogated about special treatment that he had received since he had agreed to testify in the case, an objection to this line of questioning was sustained.[11] From Hall's other testimony the jury was, however, permitted to learn that, while incarcerated, Hall had been taken to his parents' home on one or more occasions to meet with the prosecutor and that he had been in a county jail rather than a prison prior to trial.

11.  On the matters described in the text, the transcript shows:

Q.  Are you presently being kept in a Prison Unit?
SOL. STROUD: OBJECTION.
THE COURT: SUSTAINED.
EXCEPTION NO. 1366a
MR. FERGUSON: I'd like to have his answer in the record.
THE COURT: Step down and whisper to the Court Reporter.
A.  (Whispered) I have been kept with deputies and policemens and so Mr. Ferguson won't try to contact and make any threats whatsoever.

.      .      .      .      .

SOL. STROUD: May I see what he said first?
MR. FERGUSON: I OBJECT to the Solicitor seeing it before I do.
EXCEPTION NO.
SOL. STROUD: Your Honor, may we approach the bench?     .
(Conference at the bench.)
THE COURT: You will not give the answer out until after the trial, Madam Reporter.
MR. FERGUSON: Your Honor, we move for a mistrial.

THE COURT: MOTION DENIED.
EXCEPTION NO. 1367
Q.  Are you staying in any prison facility whatsoever now, Allen Hall?
SOL. JOHNSON: OBJECTION.
THE COURT: OBJECTION SUSTAINED.
EXCEPTION NO. 1368
, Q.  What special treatment have you received since you have agreed to be a witness in this case?
A.  I haven't agreed to be a witness for the State, as you put it. All I just told like I haven't agreed on nothing. All I just said was that I will tell the truth what happened. I haven't agreed to anything.
Q.  My question is, "What special treatment have you received?"
A.  None whatsoever. I don't consider being taken to my mother's house special treatment.
Q.  Would you consider staying somewhere other than a prison facility such as a hotel to be special treatment?
SOL. JOHNSON: OBJECTION.
THE COURT: SUSTAINED.
EXCEPTION NO. 1369
Q.  I don't care to ask this witness anything else.

Similarly, when Mitchell, who had been sentenced to thirty–five years in prison prior to the time he testified, was cross–examined about where he was being held, objections to the line of questioning were sustained. While counsel, but not the jury, was able to learn that Mitchell was not being held in a jail facility, counsel's effort to find out where he was being held was completely frustrated.[12] The jury did learn, however, that at some time Mitchell and Hall had been kept together in a jail, as distinguished from a prison facility.

In fact, both Hall and Mitchell, prior to trial and while the trial was progressing, were the subjects of special treatment. As found by the state post–conviction court and not disputed by North Carolina:

When transferred to Wrightsville Beach at the start of the trial, Hall and Mitchell were held at the Holiday Inn Motel for about two weeks. Their location there was discovered by the defense due to Hall standing on the balcony and waving to Mr. Ferguson as he walked by. The defense lawyers then checked into that motel, whereupon the prisoners were removed to a house at Carolina Beach. While held at the above facilities, the men were continually under the guard of approximately four police officers and sheriff's deputies who were housed with them. At these locations, the men were not ordinarily allowed outside except to go to and come from court. Nor were they allowed any visitors, male or female. Local calls out might be made with permission, but no long distance calls were authorized the prisoners. All of this was in order to maintain security. As a respite from being "cooped up", however, Mr. Stroud authorized the officers to take the prisoners, under guard, to a remote area of the beach at least one Saturday afternoon, where they and the deputies fished. He also allowed a home visit for Hall and Mitchell. No alcohol nor narcotics were given to the men by Deputy Joe McQueen or any other law enforcement personnel or prosecutors, although Hall attempted to sneak drinks in by smuggling wine back to the cottage from the home visit and by breaking into a liquor cabinet at the cottage. There is no credible evidence that Hall or Mitchell ever testified while under the influence of any intoxicants.

Small stakes card playing occurred occasionally at night with deputies giving Hall small amounts of money with which to play. Because of the above stifling confinement, Hall was often beligerent (sic). On at least one occasion, he attacked the deputies guarding him and had to be subdued. On that occasion, he was jailed for the protection of the deputies at the Carolina Beach Jail, but was

---

12. The pertinent interrogation of Mitchell follows:

> Q. You and Allen Hall are staying together during this trial, are you now?
> SOL. STROUD: OBJECTION.
> THE COURT: SUSTAINED.
> EXCEPTION NO. 1807
> Q. I'll ask you if you and Allen Hall aren't sharing a room at the Blockade Runner on Wrightsville Beach?
> SOL. STROUD: OBJECTION.
> THE COURT: SUSTAINED.
> EXCEPTION NO. 1808
> A. (Whispered) No.
> Q. Are you presently staying in any prison facility?
> SOL. STROUD: OBJECTION.
> THE COURT: SUSTAINED.
> EXCEPTION NO. 1809
> MR. FERGUSON: Like to have it put in the record.
> THE COURT: Step down.

> A. (Whispered) No.
> Q. I'd like for you to tell the Court Reporter where you are staying anywhere other than the Blockade Runner Motel.
> SOL. STROUD: OBJECTION.
> THE COURT: SUSTAINED.
> EXCEPTION NO. 1810
> MR. FERGUSON: I'd like to have it in the record.
> SOL. STROUD: May it be directed that she not divulge this record?
> THE COURT: Put it in the record and I will rule on it.
> SOL. STROUD: We OBJECT to this.
> A. (Whispered) Carolina Beach.
> THE COURT: The motion of the State is allowed that you not divulge this information as to where he is staying now to anyone until after this trial is over.
> MR. FERGUSON: EXCEPTION.
> EXCEPTION NO. 1811

subsequently released without being charged.

The testimony concerning the finding that Hall attacked one of the deputies guarding him disclosed that Hall employed a long–bladed knife in the attack and threatened to kill the deputy. Hall was subdued, taken to the nearby jail at Carolina Beach, and the prosecutor was contacted. Within two hours the prosecutor arranged for Hall to be released from jail and returned to the beach cottage. Except for the prosecutor's intervention, Hall would have remained in jail. The testimony was also that ordinarily Hall would have been charged. He was not, however, in this instance.

In addition, Hall's girlfriend was brought to him from Asheville, North Carolina, ostensibly for the purpose of terminating their romantic relationship. Again as found by the state post–conviction court and not disputed by North Carolina:

During jury selection in June, 1972, Hall had appeared distracted from the proceedings by virtue of a teenage romance. Therefore, following the continuance, Mr. Stroud sent New Hanover County Deputies Robertson and McQueen to Asheville where Hall's supposed girlfriend, Deborah Samuels, resided. The purpose of this trip was to determine the real extent of the relationship, for Hall had informed Stroud that he had met Deborah in New York, planned to marry her, and wanted her to come to Wilmington to live with his parents. However, the deputies determined that Hall and Deborah were only corresponding friends, although Deborah did desire to leave home to live with Hall's family due to disagreements with her mother. Mr. Stroud and Deborah's mother, Mrs. Jean Samuels, agreed by phone that these

plans should be terminated due to Hall's lengthy prospective imprisonment and the absence of any real feelings between the two. The deputies then transported Mrs. Samuels and Deborah from their residence in Asheville to Wilmington for a meeting to accomplish this.[13]

## II.

A. General.

The authorities that control this decision with regard to the nonproduction of the amended statement and the psychiatric report may be summarized briefly. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the *Brady* rule was both refined and expanded. There, the Court said that under *Brady* the suppression of exculpatory evidence constitutes a denial of due process vitiating a conviction in three distinct types of situations: (1) where the prosecution's case includes perjured testimony, the prosecution knew or should have known of the perjury but failed to disclose the fact, and there is any reasonable likelihood that the false testimony could have affected the judgment of the jury; (2) where the defense has requested but has been denied the production of specific evidence material to the issue of guilt; and (3) where the defense has either made no request or has made only a general request for all exculpatory evidence but the prosecution suppresses evidence of sufficient probative value to create a reasonable doubt of the guilt of the accused where

---

**13.** Petitioners contend that Hall, Mitchell and Junius were the beneficiaries of other special treatment and favors before, during, and after trial. We do not explore these. As to some, the evidence is sharply in conflict. Others, the state post–conviction court found, were not inducements for the testimony of these witnesses because they were conceived of after trial. But

the fact is Junius was given a minibike and a part–time job, the prosecutor arranged to have Hall's sentence modified to that of a "committed youthful offender" so that he could be confined under less severe conditions, and Hall and Mitchell were given small amounts of money for use at the prison canteen and a small pocket radio to share.

none theretofore existed. *d.* at 103–07, 96 S.Ct. at 2397–99. As is obvious, *Agurs* directs a less rigorous standard of materiality to be applied in order for a reviewing court to conclude that due process was denied where defense counsel has made a timely request for specific exculpatory material than where only a general request, or no request, was made. In the former case, the conclusion that due process was denied follows if the undisclosed evidence "might have affected the outcome of the defendant's trial." *Id.* at 105, 96 S.Ct. at 2398. For additional discussion of the lower threshold of materiality for specifically requested exculpatory material, see *United States v. Goldberg*, 582 F.2d 483, 488 & n.4 (9 Cir. 1978), *cert. denied*, 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979) ("affecting outcome" test synonymous with harmless error standard); and *Jones v. Jago*, 575 F.2d 1164, 1168–69 (6 Cir.), *cert. denied*, 439 U.S. 843, 99 S.Ct. 223, 58 L.Ed.2d 196 (1978) (nondisclosure of eyewitness's statement not referring to defendant requires new trial under relatively low threshold of materiality for specific requests). In effect these cases hold that a new trial is required if there was a "reasonable possibility" that the undisclosed evidence would have materially affected the verdict.

B. Hall's Amended or Corrected Statement.

■ With regard to Hall's corrected or amended statement we hold that the failure to disclose it constituted a violation of the *Brady* rule, thus invalidating the petitioners' convictions. As we have shown, Hall was a crucial witness for the state, and his credibility was the most basic issue in the case.[14] The production of his amended statement was requested once in general terms and *six* times in specific terms. Had

the jury learned that Hall's effort to rehabilitate his credibility when confronted with the numerous significant inconsistencies between his testimony and his February 18 statement was an untruth, Hall may well have been disbelieved in the entirety of his testimony and petitioners or some of them found not guilty. In short, we have no doubt that the materiality test of *Agurs* was met. Indeed, the conclusion is inescapable that Hall perjured himself in his repeated, unfounded testimony that his February 18 statement had been amended to make it conform to his testimony at trial, and this fact was bound to be known to the prosecutor who possessed the corrected statement so that the "any reasonable likelihood test" for the knowing use of perjured testimony would be applicable even if production of the amended statement had not been specifically requested. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196; *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

■ We reject North Carolina's arguments that seek to avoid the impact of *Brady* as augmented in *Agurs*. The *Brady* rule applies to the production of *evidence*, and not to "statements" or "reports" as does the Jencks Act, 18 U.S.C. § 3500. Therefore, simply because the document containing the prosecutor's notes may not have been discoverable under the Jencks Act because it was not a "statement" or "report", it does not follow as North Carolina argues, that its failure to disclose the amended statement did not violate *Brady*.[15]

■ North Carolina's argument that the prosecutor's notes were "work product" and thus protected under *Hickman v. Taylor*,

14. In *United States v. Sutton*, 542 F.2d 1239, 1241–42 (4 Cir. 1976), we recognized that "when the reliability of a witness may be determinative of guilt or innocence, nondisclosure of evidence that affects credibility is a denial of fundamental fairness required by the Due Process Clause of the Fifth Amendment." *See also United States v. Figurski*, 545 F.2d 389, 391–92 (4 Cir. 1976).

15. North Carolina's argument lacks merit for another reason. Under the Jencks Act, the notes or statements of another constitute the statement of the witness if adopted by him. *See Campbell v. United States*, 373 U.S. 487, 492–95, 83 S.Ct. 1356, 1359–61, 10 L.Ed.2d 501 (1963). In this case Hall testified that he had adopted Stroud's corrections. *See* n.7, *supra.*

329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) is lacking in merit. Although the Supreme Court held in *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), that the work product doctrine may be applied in the criminal context, it also held in that case that a party who claims the protection of that doctrine may waive his rights under it by calling a witness who testifies regarding the protected material. *Id.* at 236–40, 95 S.Ct. at 2169–71. In rejecting the defendant's claim that the statement of one of his attorney's investigators was protected from discovery by the work product rule, the Court stated:

> The privilege derived from the work product doctrine is not absolute. Like other qualified privileges, it may be waived. Here respondent sought to adduce the testimony of the investigator and contrast his recollection of the contested statements with that of the prosecution's witnesses. Respondent, by electing to present the investigator as a witness, waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work product doctrine to sustain a unilateral testimonial use of work product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross–examination on matters reasonably related to those brought out in direct examination.

*Id.* at 239–40, 95 S.Ct. at 2170–71 (citations and footnotes omitted). As in *Nobles*, North Carolina waived its work product privilege when its witness, Hall, in defending his credibility, referred to and relied upon the evidence North Carolina seeks to claim as its "work product."

It follows that the convictions were obtained in violation of petitioners' right to due process of law when Hall's corrected statement was withheld from them.

### C. Hall's Psychiatric Report.

We do not doubt that Hall's psychiatric report if it had been made available to defense counsel might have had a substantial impact on the outcome of the case. If the jury had known that Hall was a borderline defective, it might well have concluded that Hall lacked the ability to recall accurately events, about which he testified with such exquisite detail, that had occurred at least one and one–half years prior to the time that he was testifying. That Hall possessed limited intelligence was a fact which the jury could properly have known for its effect on his credibility. *See United States v. Society of Independent Gasoline Marketers of America*, 624 F.2d 461, 469 (4 Cir. 1980). Nor do we doubt that his statement in the report that he did not participate, although present on the scene, in the burning of the store when he testified to the contrary at trial would surely shake his credibility.

As we see it, the only problem that nonproduction of the hospital report presents is the test to be applied in determining if petitioners were denied due process. If defense counsel made only a general request for exculpatory material, we do not think that the *Agurs* test was satisfied because we cannot say that, standing alone, the effect of the hospital report on Hall's credibility would create a reasonable doubt of guilt where one did not theretofore exist. But if the request was specific, we do not doubt that the evidence was material.

■ We conclude that the request was specific. It did not simply ask for "all *Brady* material" or for "anything exculpatory" with a consequent lack of effective notice to the prosecutor of what was sought. *United States v. Agurs*, 427 U.S. at 106–107, 96 S.Ct. at 2398–99. Rather the request identified "psychiatric or other reports which might tend to reflect on the credibility or competence of any ... prospective witnesses ...." Although a specific witness was not named, we think that the prosecutor had ample notice of what was sought, particularly when he knew that Hall's competence to stand trial for his participation in the events of February 6, 1971, had recently been established in a case in

which that same prosecutor had participated.[16]

We are not persuaded by North Carolina's argument that the hospital report was not suppressed because it was a public document available to defense counsel or that defense counsel obviously had the report. As to the latter, it is true that defense counsel did ask Hall questions about his IQ and whether he had been in a mental institution, but it is inconceivable to us that if defense counsel possessed the report they would have failed to have introduced the report or made further use of it as impeachment evidence. Certainly in argument defense counsel deny that they had the report at the time of trial, and the record is clear that the prosecutor did not produce it before trial as he was ordered to do.

■ Under North Carolina law, N.C.Gen. Stat. § 15A–1002(d), a court–ordered report as to the mental capacity of an accused does not become a public record unless it is introduced into evidence. North Carolina has offered no evidence that at Hall's trial this was done. Absent such evidence, we think it was probably true that the report was not introduced since the report concluded that Hall was competent to be tried, and it was Hall or his attorney who sought the examination in an effort to assist Hall. In any event, there is no general "public records" exception to the *Brady* rule, although it has been held that *Brady* is satisfied if a prosecutor discloses how to obtain a public record. *See Lewis v. United States*, 393 A.2d 109 (D.C.1978). No such advice was given here.

We think therefore that the suppression of Hall's psychiatric record also denied petitioners due process of law invalidating their convictions.

### III.

■ We think that the trial court's limitation on the cross–examination of Hall and Mitchell to uncover the special treatment that they indisputedly received constituted error of constitutional magnitude. On this record, *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) compels that result.

The record is clear that when counsel sought to explore with Hall his initial denial of special treatment, that line of questioning was prohibited. It is true that some minor instances of special treatment had been made known to the jury from other testimony of Hall, but the amenities of his incarceration, his visits home, the visit of his girlfriend, and above all the decision not to punish him for his attack on his guard were all withheld from the jury. To a lesser extent, the same is true with respect to Mitchell. As we have shown, these witnesses, especially Hall, were crucial to North Carolina's case, and the case rested on the jury's determination of their credibility.

One of the most important factors affecting credibility is the presence of any bias, prejudice or incentive on the part of a witness to favor one party to the litigation. That point is made plain in *Davis.* There, it was held that the Sixth Amendment right of confrontation of witnesses requires that a defendant in a state criminal case be allowed to impeach the credibility of a prosecution witness by cross–examination directed at possible bias deriving from the witness's probationary status as a juvenile delinquent notwithstanding that such impeachment would conflict with the state's policy of preserving the confidentiality of juvenile delinquency adjudications. Some of the language of the Court's opinion is particularly apt in this case. After holding that the main and essential purpose of the Sixth Amendment right to confrontation is to secure the opportunity of cross–examina-

---

**16.** There is also a possible knowing use of perjured testimony in connection with this report. Hall testified that he had not undergone a mental examination, and the trial court refused to allow defense counsel to ask Hall in the presence of the jury whether he had been examined by a psychiatrist. Hall did answer the question out of the presence of the jury in the negative, and the prosecutor did not disclose the report although he possessed proof positive that the answer was untrue.

tion, the Court noted that one way to discredit a witness is to introduce evidence of a prior criminal conviction of that witness "to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony." 415 U.S. at 316, 94 S.Ct. at 1110, the Court then added:

> ‚A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case in hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

*Id.* (citation omitted).

Of course in *Davis* it was recognized that the judge may and properly should limit cross-examination which seeks to invade the witness's constitutional protection against self-incrimination or to harass, annoy or humiliate him. *Id.* at 320, 94 S.Ct. at 1112. No such considerations are present here. Other cases have held that a trial court may limit cross-examination if the information sought could endanger the witness. *See, e. g., United States v. Watson,* 599 F.2d 1149, 1157 (2 Cir. 1979); *United States v. Rice,* 550 F.2d 1364, 1370 (5 Cir. 1977); *Caldwell v. Minnesota,* 536 F.2d 272, 273–74 (8 Cir. 1976). In this case, however, the record of any possible danger to Hall or Mitchell if their whereabouts were known or if the previous favors afforded them were disclosed was not developed other than the oblique reference of Hall to possible threats by defense counsel. We cannot infer from the very nature of the case, as North Carolina argues, that the witness would be endangered by disclosure of the place where they were kept, the conditions of their confinement, or any special treatment that they received.

Of course, had the cross-examination been allowed, Hall or Mitchell might not have answered truthfully. In that event, if the prosecutor did not disclose the truth of the matter, there would arise a problem under *Brady* as with Hall's amended statement and his psychiatric report. Had Hall and Mitchell answered truthfully, we do not suggest that they necessarily would have become discredited witnesses. All we can say is that, in the words of *Davis,* "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [their] testimony . . . ." 415 U.S. at 317, 94 S.Ct. at 1110. *See also Gordon v. United States,* 344 U.S. 414, 422, 73 S.Ct. 369, 374, 97 L.Ed. 447 (1953).

Petitioners were improperly prohibited from attacking the credibility of two important prosecution witnesses by showing possible bias or incentive to support the prosecution's case. This, they had a Sixth Amendment right to do, and thus we must conclude that they were convicted in violation of their Sixth Amendment rights.

Accordingly, the judgment of the district court is reversed, and the consolidated cases are remanded with directions to grant the relief prayed.

REVERSED AND REMANDED.