FLOYD, Circuit Judge,
concurring in part and concurring in the judgment:
One of the issues we address today is whether, consistent with the Sixth Amendment, the government may convict a criminal defendant through the use of anonymous witnesses — that is, witnesses who testify using pseudonyms and whose true names remain unknown to the defense. I think not. Thus, I write separately because, in my opinion, the district court erred when it allowed two of the government’s witnesses to testify using pseudonyms without requiring that the government disclose their true names to the defense. But, because the error was harmless, I would nevertheless affirm the judgment of the district court.
I.
A.
The right to cross-examination, which the Sixth Amendment guarantees,[1] is essential to ensuring that criminal defendants receive a fair trial. See Pointer v. Texas, 380 U.S. 400, 404-05, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Supreme Court has long recognized that “[t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country’s constitutional goal.” Id. at 405, 85 S.Ct. 1065.
Cross-examination is, practically speaking, one of the most valuable tools a criminal defendant has to contest the government’s case, for it is the primary means through which he may challenge a witness’s testimony against him. See Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Through effective cross-examination, the criminal defendant may ferret out falsehoods and expose inconsistencies in a witness’s testimony, see Pointer, 380 U.S. at 404, 85 S.Ct. 1065, as *504 well as challenge the witness’s perceptions and memory, Davis, 415 U.S. at 316, 94 S.Ct. 1105. Cross-examination further provides the defendant with the opportunity to impeach the witness’s credibility by demonstrating bias, prejudice, or ulterior motive, or by revealing facts about the witness that suggest an untruthful disposition. See id. In short, the right to confront and cross-examine witnesses “ensure[s] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.” Maryland v. Craig, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).
Yet the importance of cross-examination in a criminal trial extends beyond the practical benefits it confers upon the defendant. The availability of meaningful cross-examination also fosters society’s perception that criminal trials are open and fair. Lee v. Illinois, 476 U.S. 530, 540,106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). It does so by “ensuring that convictions will not be based on the charges of unseen and unknown — and hence unchallengeable — individuals.” Id. If safeguarded, it reflects that, in a court of law, criminal trials are even contests between the government and the accused. See id.
Criminal defendants do not have free rein on cross-examination, however. The Sixth Amendment “guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.” Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Trial judges thus possess “wide latitude ... to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witnesses] safety, or interrogation that is repetitive or only marginally relevant.” Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); see also Chavis v. North Carolina, 637 F.2d 213, 226 (4th Cir.1980) (recognizing the trial court’s discretion to limit cross-examination for many of the same reasons). Because we entrust trial judges with such discretion, we review a trial court’s limitations on a criminal defendant’s cross-examination for an abuse of discretion. United States v. Smith, 451 F.3d 209, 220 (4th Cir.2006).
B.
The Supreme Court, in Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), confronted the issue of whether a trial court may prohibit a criminal defendant from inquiring on cross-examination as to the true name of the witness testifying against him. The defendant was charged with, and ultimately convicted of, illegally selling narcotics. Id. at 129, 88 S.Ct. 748. The primary witness against him was a man who identified himself as “James Jordan.” Id. at 130, 88 S.Ct. 748. The witness claimed to have purchased narcotics from the defendant, and the case hinged in large part on whose story the jury believed: the witness’s or the defendant’s. Id. On cross-examination, the witness admitted that James Jordan was not his real name. Id. The defense attorney then asked the witness what his true name was, but before the witness could answer, the government objected. Id. The trial court sustained the objection, forbidding the defense attorney from inquiring as to the witness’s true name. Id. On appeal, the Appellate Court of Illinois affirmed the defendant’s conviction. Id. at 129, 88 S.Ct. 748.
The Supreme Court held that the trial court’s prevention of the defense attorney from inquiring into the witness’s true *505 name violated the defendant’s Sixth Amendment right to cross-examination. Id. at 133, 88 S.Ct. 748. Although the Court recognized that the case did not involve the “complete denial of all right of cross-examination,” it observed that “when the credibility of a witness is in issue, the very starting point in ‘exposing falsehood and bringing out the truth’ through cross-examination must necessarily be to ask the witness who he is and where he lives.” Id. at 131, 88 S.Ct. 748 (footnote omitted) (quoting Pointer, 380 U.S. at 404, 85 S.Ct. 1065). It then noted that “[t]he witnesses] name and address open countless avenues of in-court examination and out-of-court investigation.” Id. It concluded that “[t]o forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.” Id.
Justice White authored a concurrence, which Justice Marshall joined, advocating that the personal safety of witnesses was a proper reason to limit cross-examination. Id. at 133-34, 88 S.Ct. 748 (White, J., concurring). He maintained that, before barring a question that is normally appropriate, courts should require either the government or the witness to demonstrate why the witness should not have to answer it. Id. at 134, 88 S.Ct. 748. According to Justice White, the trial court could “then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling.” Id. Ultimately, he concluded that, in the case presented, neither the State nor the witness had made any showing to justify allowing the witness to refuse to provide his name. Id.
Many courts have since seized upon Justice White’s concerns and held that Smith does not compel a rigid rule of disclosure of a witness’s true name and address when it would pose a threat to the witness’s safety. See, e.g., United States v. El-Mezain, 664 F.3d 467, 491-92 (5th Cir. 2011); Siegfriedt v. Fair, 982 F.2d 14, 17 (1st Cir.1992); United States v. Rangel, 534 F.2d 147, 148 (9th Cir.1976); United States v. Palermo, 410 F.2d 468, 472 (7th Cir.1969); People v. Stanard, 42 N.Y.2d 74, 396 N.Y.S.2d 825, 365 N.E.2d 857, 863 (1977). But at least one of these courts has indicated trepidation when it is the witness’s true name that the government seeks to withhold. See Palermo, 410 F.2d at 472 (“Under almost all circumstances, the true name of the witness must be disclosed.”). Furthermore, not all courts have allowed the government to completely withhold the true names of witnesses from the defense, even when the safety of the witnesses was in danger. See, e.g., United, States v. Celis, 608 F.3d 818, 829-30 (D.C.Cir.2010) (describing a district court’s protective order that allowed witnesses to testify using pseudonyms but required disclosure of their true names to defense counsel); Alvarado v. Superior Court, 23 Cal.4th 1121, 99 Cal.Rptr.2d 149, 5 P.3d 203, 223 (2000) (“[W]hen nondisclosure of the identity of a crucial witness will preclude effective investigation and cross-examination of that witness, the [CJonfrontation [Cjlause does not permit the prosecution to rely upon the testimony of that witness at trial while refusing to disclose his or her identity.”).
These latter courts often utilize or advocate protective orders as a means of balancing the criminal defendant’s right to cross-examine a witness with the need to protect the witness’s safety. See Celis, 608 F.3d at 829-30 (approving the district court’s use of a protective order); Alvarado, 99 Cal.Rptr.2d 149, 5 P.3d at 206 (“[W]e emphasize that the trial court remains free to fashion a more limited order denying, restricting, or deferring disclosure of the identity of each witness before trial (including limiting disclosure to defendants’ counsel), as long as that order does *506 not impermissibly impair defendants’ right to confront and cross-examine the witnesses effectively at trial.”). For example, in Celis, the district court entered a protective order that allowed witnesses to testify using pseudonyms, but required the government to release their true names to defense counsel. Celis, 608 F.3d at 829. The order further provided that defense counsel could, in turn, share the names with the represented defendants and one other member of the defense team, but it prohibited sharing the names with anyone else without leave of the court. Id. During the trial, the district court allowed defense counsel to perform limited investigations of some of the witnesses in Colombia and postponed cross-examination in at least one instance to allow for an authorized investigation. Id. at 830. The D.C. Circuit approved this practice, determining that it appropriately balanced the defendants’ right to cross-examination with the need to protect the safety of the witnesses. See id. at 833-34.
II.
A.
I do not take lightly the safety concerns accompanying the decisions made by Juan Diaz and Jose Perez — the two witnesses who testified using pseudonyms[2] — to testify against Ramos-Cruz. As the record reflects, MS-13 has demonstrated its willingness to engage in violent reprisal against witnesses who testify against its members. There is no denying that by agreeing to testify against Ramos-Cruz, Diaz and Perez exposed themselves to danger. Most assuredly, requiring them to state their true names in open court would have made it easier for MS-13 to target them and their families. Safety concerns were thus real and valid.
We must recognize, however, that these concerns inhere in many prosecutions of defendants who are members of violent criminal organizations. The sad truth is that, in this respect, the situation presented in today’s case is not rare. Gangs often employ violence as a means of intimidating witnesses. Laura Perry, Note, What’s in a Name?, 46 Am.Crim. L.Rev. 1563, 1580 (2009); Joan Comparet-Cassani, Balancing the Anonymity of Threatened Witnesses Versus a Defendant’s Right of Confrontation: The Waiver Doctrine After Alvarado, 39 San Diego L.Rev. 1165, 1194-96 (2002). Witness intimidation is a serious problem of an alarming magnitude, and it plagues many of our communities. See Alvarado, 99 Cal. Rptr.2d 149, 5 P.3d at 222 & n. 14; CompareWCassani, supra, at 1194-204. As a result, the prosecution of members of violent gangs — such as this prosecution of Ramos-Cruz — will often trigger safety concerns for many of the witnesses involved.
B.
Nevertheless, in addressing these concerns, we cannot undermine our constitutional commitment to ensuring that criminal defendants, even those accused of belonging to violent criminal organizations, receive a fair trial. That means they must be allowed to rigorously test the government’s evidence, including all of its witnesses, in an adversarial proceeding before a jury. See Craig, 497 U.S. at 845, 110 S.Ct. 3157; See Strickland v. Washington, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). I am unconvinced that they are able to do so if the government can completely withhold the true names of its witnesses throughout the trial.
*507 Access to the true names of the government’s -witnesses is critical to ensuring that a criminal defendant is able to rigorously test their testimony in an adversarial manner. As noted, effective cross-examination often entails challenging the witness’s credibility. Hence, the opportunity for effective cross-examination, which the Sixth Amendment guarantees, includes the opportunity to challenge the witness’s credibility. See Van Arsdall, 475 U.S. at 679-80, 106 S.Ct. 1431. But without a government witness’s true name, the criminal defendant is unable to perform the type of investigation — whether in court or out of court — necessary to be able to challenge his credibility. See Smith, 390 U.S. at 131, 88 S.Ct. 748. The criminal defendant cannot explore the witness’s background and qualifications to discover any facts that might reflect poorly on his credibility. See Alvarado, 99 Cal.Rptr.2d 149, 5 P.3d at 221. In effect, denying a criminal defendant knowledge of the true names of the government’s witnesses severely inhibits his ability to perform what is often the most potent aspect of effective cross-examination: impeachment. In my opinion, because completely forbidding a criminal defendant from learning a witness’s true name prevents the opportunity for effective cross-examination, it denies the defendant a fundamental aspect of a fair trial.
My concerns with completely denying criminal defendants access to the true names of the witnesses testifying against them extend beyond practical consequences. Allowing the use of anonymous witnesses also undermines the perception that our criminal trials are open and even contests. Instead, it creates the impression that our criminal trials contain clandestine aspects that operate to provide the government with an upper hand. It does so by suggesting that convictions can be “based on the charges of ... unknown— and hence unchallengeable — individuals,” Lee, 476 U.S. at 540,106 S.Ct. 2056, even if they can be physically seen. Simply put, obtaining a conviction by using anonymous witnesses appears eerie and covert, and does not inspire confidence in the promise that our criminal trials are open and even endeavors.
Thus, even when safety concerns exist, district courts should require disclosure of the government’s witnesses’ true names to the defense, even if the disclosure is limited.[3] Along these lines, I embrace the approach approved by the D.C. Circuit in Cells. If, for safety reasons, the district court finds it necessary to allow a witness to testify using a pseudonym in open court, it should require the government to disclose the true name of the witness to defense counsel outside of court. The district court could, in its discretion, fashion a protective order limiting the extent of further disclosure and determining at what stage disclosure must occur. This would allow the district court to ascertain, on an individualized basis, whether defense counsel’s proposed avenues of investigation are necessary to ensure the opportunity for effective cross-examination and whether *508 they would unduly expose the witness to danger. In my mind, this approach strikes an appropriate balance between a criminal defendant’s right to a fair trial and the safety concerns accompanying some witnesses’ testimony. It does not sacrifice one to the other.
Because the district court allowed Perez and Diaz to testify using pseudonyms and completely denied the defense access to their true names, I think it abused its discretion. Ramos-Cruz, without access to Diaz’s and Perez’s true names, was unable to conduct any meaningful inquiry into their backgrounds or qualifications. This strikes me as especially problematic with respect to Diaz, who the district court allowed to testify as an expert on MS-13 in El Salvador. By denying Ramos-Cruz any access to Diaz’s and Perez’s true names, the district court essentially denied him the opportunity to cross-examine them in any meaningful manner on facts suggesting bias, prejudice, ulterior motives, or untruthful disposition. As a result, I do not think the court provided Ramos-Cruz with the opportunity to conduct effective cross-examination.
C.
The government maintains that defense counsel had the opportunity to conduct effective cross-examination despite not knowing Diaz’s and Perez’s true names. In so arguing, it emphasizes the information it provided the defense. For instance, it notes it supplied defense counsel with the transcript of Diaz’s and Perez’s previous testimony. It further observes it informed defense counsel that the witnesses did not have any Giglio issues[4] and that the district court also questioned the witnesses about their background during an ex parte hearing, from which the defense was excluded, to ensure no such issues existed. The government insists that defense counsel’s suggestion that it could have unearthed impeachment material if provided with the witnesses’ true names is mere speculation. In light of all of this and the fact that defense counsel had the opportunity to cross-examine Diaz and Perez in person, the government contends the limitation on Ramos-Cruz’s ability to discover their true names was an appropriate exercise of the district court’s discretion.
I find this argument, particularly as it relates to the government’s and district court’s inquiries into the witnesses’ backgrounds, unpersuasive. Our method of criminal adjudication relies upon the “common-law tradition ... of live testimony in court subject to adversarial testing,” not the civil law inquisitorial method of “examination in private by judicial officers.” Crawford v. Washington, 541 U.S. 36, 43, 124 S.Ct. 1354,158 L.Ed.2d 177 (2004); see also id. at 50, 124 S.Ct. 1354 (recognizing that “the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure”). We thus define a fair trial as one in which the evidence is subject to adversarial testing. Strickland, 466 U.S. at 685, 104 S.Ct. 2052. But here, the district court and the government investigated Diaz’s and Perez’s backgrounds in private. They then announced to the defense that the witnesses had nothing to disclose and, by refusing to provide the witnesses’ true names, effectively prevented defense counsel from verifying this information. In this respect, what took place below resembles more the inquisitorial method of examination than our adversarial method. *509 Because we rely upon the adversarial method as the hallmark of a fair trial, I am unable to accept the government’s and district court’s investigations into the witnesses’ backgrounds as adequate substitutes for defense counsel’s ability to do the same.
Nor do I find persuasive the government’s argument that “[a]ny suggestion that the defense would have unearthed impeachment material if [it] had learned the witnesses’ identities is mere speculation.” Because the defense does not have the true names of the witnesses, it is unable, and cannot be expected, to know whether any specific impeachment material exists. All it can do is speculate. But the government seeks to justify not turning over the true names because defense counsel can only speculate that impeachment material exists. This circular reasoning is unappealing to me. Credibility is a potential issue for every witness, and often the only way to know whether a witness has credibility issues is to investigate the witness’s background. We rely on the adversarial method to reveal credibility issues, which means criminal defendants must be given the tools essential to doing so.
Finally, I do not agree with the government that Ramos-Cruz had the opportunity to conduct effective cross-examination because it supplied him with the witnesses’ prior testimony and he was able to confront them in person. This argument ignores the fact that the opportunity for effective cross-examination entails not only the ability to question witnesses on the substance of their testimony, but also to impeach their credibility by demonstrating bias, prejudice, ulterior motives, or an untruthful disposition. Access to a witness’s true name is often the essential first step to determining the existence of such facts that would impugn the witness’s credibility. I therefore cannot say that Ramos-Cruz had the opportunity to cross-examine Diaz and Perez effectively when he was essentially denied the opportunity to impeach their credibility.
III.
My finding of error does not end the inquiry, however. Harmless-error analysis applies to unconstitutional limitations on a criminal defendant’s right to cross-examination. See Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. “The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.” Id. To find an error harmless beyond a reasonable doubt, we must “be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.” United States v. Abu Al% 528 F.3d 210, 256 (4th Cir.2008) (quoting United States v. Brooks, 111 F.3d 365, 371 (4th Cir.1997)) (internal quotation marks omitted). The Supreme Court has set forth a nonexhaustive list of five factors to guide this inquiry: 1) “the importance of the witnesses] testimony in the prosecution’s case”; 2) “whether the testimony was cumulative”; 3) “the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points”; 4) “the extent of cross-examination otherwise permitted”; and 5) “the overall strength of the prosecution’s case.” Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431.
Although I think the district court erred in allowing Perez and Diaz to testify using pseudonyms without any disclosure of their true names to the defense, I nevertheless would find the error harmless be *510 yond a reasonable doubt. Even operating under the assumption that if provided access to Perez’s and Diaz’s true names Ramos-Cruz would have discovered damaging information that would have allowed him to discredit their testimony completely, I can safely say with assurance that the error did not substantially sway the judgment of the jury.
Perez and Diaz primarily testified as to the organization of MS-13 and how MS-13 in El Salvador was linked to MS-13 in the United States to prove that the gang was a criminal enterprise for purposes of the racketeering charges. Other evidence amply proved it was a criminal enterprise and demonstrated the link between MS-13 in El Salvador and MS-13 in the United States. Diaz’s and Perez’s testimony was cumulative and not critical to establishing that MS-13 is a criminal enterprise. The strength of the government’s case as to this element was strong. Thus, even if the jury had not given any weight to Diaz’s and Perez’s testimony, the other evidence established beyond a reasonable doubt that MS-13 is a criminal enterprise with ties that extend from the United States to El Salvador.
IV.
For these reasons, I decline to join Part II.C of the majority’s opinion, but nevertheless join in affirming as to the issue. Otherwise, I am pleased to concur in the remainder of the majority’s opinion.

. Although the Sixth Amendment does not explicitly mention the right to cross-examination, the Supreme Court has recognized that the right of confrontation includes the ancillary right of cross-examination. See Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

. I refer to the witnesses using their pseudonyms throughout my opinion.

. I would not limit this disclosure requirement to crucial witnesses, as at least one court has, see Alvarado, 99 Cal.Rptr.2d 149, 5 P.3d at 223. The Sixth Amendment guarantees criminal defendants the opportunity for effective cross-examination of all government witnesses, irrespective of their relative importance to the government’s case. Because, in my opinion, this requires access to the witnesses’ true names, I would not distinguish between crucial and noncrucial witnesses. Nor would I limit my disclosure requirement to instances in which it is clear that the witness’s credibility will be at issue. A witness's credibility is always potentially at issue, depending on what, if anything, the defense learns about the witness. In fact, the defense needs the witness’s true name to determine whether credibility will be an issue.

. In Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court determined that the government must disclose evidence adversely affecting the credibility of its witnesses. Id. at 153-54, 92 S.Ct. 763.